Good morning, and may it please the court, my name is Christopher Lundberg and I represent the plaintiff Brenda Davis in this matter. I'd like to limit my arguments in Ms. Davis's claim on retaliation as related to the termination of her employment with Pelican Bay. And I'd like to reserve three minutes in rebuttal. As I begin my argument, I'd like to bring to the court's attention a case we did not cite that was recently released by the Ninth Circuit on March 21, 2012. It's the Imeldi v. University of Oregon case. And that case, I think, provides a very good framework to analyze the retaliation. Scalia, would you please give the clerk a slip with the citation to the case? Yes, I will, Your Honor. And also give a copy to your opponent. You should do it before the argument so your opponent has a chance to look at the case and respond to your arguments. I will make a point of doing that, Your Honor. I apologize. In fact, I could share it with opposing counsel now. It's on my iPad, if that would be helpful. Probably not going to do her a lot of good now. Well, I just found out about this case recently as well, Your Honor. Well, recently, it gives you plenty of time to mail it in to us so we can look at it and for your opponent to look at it. Fair enough, Your Honor. My apologies. My apologies, Mr. Chairman. The case is a retaliation – it's a case that came before the Court on a dismissal at the summary judgment stage of a retaliation claim under Title IX, but they analyzed it under Title VII as a claim of gender discrimination and retaliation. And what is interesting in that case that I think applies here is the Court basically reversed that decision on the basis that they determined that the district court sort of suspended the tried and true rules of summary judgment analysis of the evidence. And in particular, the evidence in that case was primarily driven by a declaration submitted by the plaintiff. And the Court reiterated that in Title VII kind of cases, there's a very low threshold with respect to the amount of evidence that's required and that the benefits of the inferences and the crediting of the allegations have to be given to the nonmoving  And in this case, as in that case, which as in all Title VII retaliation cases, there's a prima facie sequence that has to be established. There has to be a protected act. There has to be an adverse action. There has to be the causal link. And there has to be, if there's a legitimate non-discriminatory basis for the termination propounded, there has to be a pretext showing. And in this case, we have a protected act. We have what I've counted in Ms. Davis' declaration, 13 reports of what I would describe as protected conduct, reports of sexual harassment and hostile work environment. And then we have three reports in the fall of 2007, which preceded, she was terminated December 20, 2007, beginning in the end of September through December 17, I believe, three additional reports of protected conduct regarding retaliation for her reports. The adverse action was obviously the termination. And the causal link has four or five primary factors that I think are important. First is the timing, which creates a circumstantial inference that the reports were related to the termination. The second is that the person who was involved in the decision, Dr. McCarthy, knew of her reports. There's evidence in the record straight out of her declaration that she knew. There's an acknowledgment letter that was sent, and I can cite that to the record, that refers to a she, Ms. Davis, had submitted an EEO complaint, an internal complaint of discrimination, that was then acknowledged by Mr. Nimrod in the letter back to her on October 25th, in which he recognizes that she had submitted a claim of discrimination and retaliation by Dr. Archambault, and that he was going to further notify those two individuals that the claims had been made against them and they weren't to retaliate. We also, so I think there it creates an inference that they were aware of it as well. We know that Dr. Mandel and Archambault were both very angry about the fact that Dr. McCarthy was angry about these reports. That comes from her declaration as well, and we know that Dr. McCarthy was angry as well. And then I think the ---- So focus on the termination, right? And do you have anything that deals more directly with the reasons cited by the State, which is that the Federal receiver says don't go contract workers, go civil service workers? I mean, as I understand it, your clients acknowledged that was common knowledge, and yet they elected to stay on the contract basis. Why is that a pretext? Well, I think there's four reasons for that, Your Honor. First of all, the ---- my client, Ms. Davis, and I think it's important to separate this, Dr. Roy, David Roy, there's some cites of his. He had moved from being a civil service to contract. Your client never went to civil service, always stayed contract. Correct. But when the evidence regarding whether she was notified that they were moving away from contract to civil service with respect to her claim is sparse. Well, whether she was notified or not doesn't matter. The question is whether the reason was legitimate. And there's nothing to suggest the reason didn't exist, that in fact that that wasn't what was happening. Well, I disagree, Your Honor, and here's why. I think the receivership's mandate was not about moving away from contract workers to civil service employees. The receivership's mandate was related to provision of constitutionally mandated adequate medical care to prisoners. That was not the case. I don't think you need to tell this panel, particularly our senior member, much about what the mandate entailed. I understand that, Your Honor. I understand that. But isn't it true that one of the results or one of the implementations was a move toward civil service as opposed to contract?  Okay. That's the reason offered by the State. What makes that a pretext? Because of the timing of this particular dismissal, because there was a need for social clinicians at the time. There was a shortage of clinicians on staff, and there was a mandate that said prisoners need to be provided adequate medical care. So the circumstances didn't justify the termination at that time. There was a need for them. And they had been in a contract status for years, and there had always been this circumstance where they were aware that there was going to be a move to civil service employees. That's why Mr. Roy went into civil service. That's why Ms. Davis had applied. And he left. And he left. I agree with that. I understand that. But my point is that it hadn't ever happened. Okay. And so it was going to happen. A little catch-22, because as she tells it, she was at a pretty constant war with her colleagues, her supervisors as well. So when would have been an appropriate time for the State to say, look, we're moving to civil service, not contract, so your contract is not going to continue? When there was a need was lessened. There was no shortage of clinicians. There was adequate staff. There was people who could provide the services that were needed. Is there any evidence that after the termination of the contracts there were insufficient services? I mean, on a constant basis there are insufficient services. And I suspect Pelican Bay is more extreme than most. But is there any evidence in this record with regard to what services were no longer available after the termination of their contracts? Yes, there is. There's Ms. Davis's declaration and affidavit, paragraph 65, where she says that at the time that she and Dr. Roy were terminated, Pelican Bay State Prison was desperately short on highly qualified mental health staff. Even with Dr. Roy and myself working, the mental health staff was short on qualified clinicians and care managers. I have personal knowledge of this from the weekly IDTT minutes of the mental health staff meetings and interacting with the professional and custodial mental health staff on a daily basis. That tells us nothing about what was available after her departure. Is there anything in the record? And my question may not have been clear, so I'll apologize. But I'm saying, you're arguing that after they terminated your clients, there wasn't enough. Is there any evidence in the record to that effect, that their services couldn't be replaced by civil service or other workers? Well, to the extent that there was, I think one could draw a reasonable inference from that, what I just quoted, that there was not adequate staff at the time they were terminated. Your argument, as I thought I heard it, was that, look, they weren't replaced, and so after they left, the fact that they weren't replaced, there wasn't adequate staff, that demonstrates the motivation here must have been something different. You've told me nothing about whether or not they, in fact, were replaced by civil service employees. You've told me that the staffing was inadequate before. I'll accept that as a given. That doesn't tell me the staffing was more inadequate afterwards. Well, what this statement does, I hear what you're saying and I understand it. I'm not trying to be argumentative, Your Honor. I'm trying to simply say that with respect to the – what I just said and also where she says in paragraph 66 that she has personal knowledge that when they were terminated, they were actively advertising, is that at the time they were terminated, they were short-staffed. There was a heightened medical need, an urgent need for them at that time, which terminating them at that time when there's a heightened need would be contrary to the mandate, in my view. What happened after that, we don't have any evidence in the record at this stage whether or not they were a sufficient staff on hand. Well, we do know that they – their positions remained open for a long time after they were terminated, though. Correct. Correct. Also, I think in the record, she indicates that she was – she had worked there for seven years and five months and her work was deemed exceptional and that, as I said, she had never before been subject to this kind of short-notice termination before. David Roy, in his affidavit 35, paragraph 35, says that – and to your point, Your Honor, he says, In this case, when Dr. McCarthy discharged Dr. Davis and me, new staff had not arrived to replace us and, in fact, did not arrive for weeks and even months later. I certainly was not allowed to train them to assume my duties. This was contrary to the procedure I had personally witnessed in my nine years at the institution, that when new staff was hired, time was allowed for departing staff to train them. So I think what the evidence in the record on this point is that they were treated differently with respect to this termination in the time when there was a heightened need for their services in ways that had never preceded them before and that there was a no filling of their position for some time. I think the circumstantial evidence and the inference that reasonably flows from that is that this was – that the stated reason for the discharge was pretextual. It's a live, factual question, is my point. Well, isn't there also one other point, that McCarthy met with Davis before the termination and told her it was a mistake to break the code of silence? Oh, yes, Your Honor. And Mandel had friends? Oh, yes. Oh, yes. That's a huge part of it, the threats, Your Honor. I mean, there was a threat on September 6th, which is when McCarthy said, don't break the code of silence. There was a threat on October 2nd when Archambault says he's good friends with Mandel and she's not going to be there very long. There's threats on the same day where Dr. McCarthy told Brenda that Archambault, who had just made the threat, was going to be – this is later, was involved in the decision. In October as well, Dr. McCarthy glares at her, threatens her, said she made a mistake in reporting it, and it was – and this allegation is so specific. She described – Ms. Davis described smelling – the smell of tobacco on his voice because he was leaning in and his voice – he was enraged. All of those go to the same basic point, that this – there was a causal connection between her reports, protected activity, and her termination, and that the so-called legitimate basis for the termination was pretextual. Do you have two and a half minutes left if you want to save them for later? Thank you. I'll reserve that for about – thank you, Your Honor. Good morning. May it please the Court. Bonnie Chan, Deputy Attorney General for the State Appellees. The key weakness in Appellant's case is their failure to connect their allegations to any gender-based hostility. Although Appellants point to a few instances between Mandel and Davis, those incidents were not based on Davis's gender or were not directed at her. The evidence shows that Davis and Mandel worked together for seven years, until the point that Davis asked that she be – that he be removed as her supervisor. The evidence also shows that Davis applied for a permanent civil service position in March 2007 with the prospect of continuing to work with Mandel on a permanent basis. The evidence also shows that as late as spring 2007, Davis told Maureen McLean that she was happy working under Ms. McLean's administration as the healthcare manager at Pelican Bay. So, therefore, even taking Appellant's allegations at full face value under the summary judgment standard, the evidence shows that Appellant's allegations aren't enough to change the terms and conditions of her employment. But why don't you proceed to the retaliation claim, because maybe there are other – I'm sure there are other issues with regard to the various claims, but we spent the time of your opponent's time discussing retaliation. And if you have any response to what he said, I think it would only be fair to give you the time to do that. Thank you, Your Honor. Yes, at first blush, the timing of the events looks suspicious, but as the Court has pointed out, under the backdrop of the receiver's mandates, there's evidence in the record that it was communicated to Maureen McLean that it would be a priority of the receiver to reduce contract work and to increase civil service work. Well, there is evidence in the record that, in fact, there wasn't an increase in the civil service work. I mean, at least Dr. A's declaration says the positions went unfilled. So that suggests that, well, it's not like we're going to take out the contract worker and put in the civil service worker. All they did was take out the plaintiffs. Right. So how does the receiver's mandate justify that? Well, I don't know how it is in the Federal government, but in State government, things can be slow, especially with regard to hiring and with civil service statutes and all the things that need to be cleared by the DPA. But, well, wouldn't you – if you're trying to replace somebody, wouldn't you wait ordinarily for the replacement to show up before you push the first person out the door? Well, I believe the priority was not replacement. I believe the priority was to stop the State from hemorrhaging money and to get things moving in terms of the receiver. Well, that certainly wasn't the priority of the mandate of the receiver, wasn't to save the State money. It was to improve the care of the prisoners. Yes, Your Honor. But I believe – And that's not improved by – Judge Clifton asked. It's not improved by reducing the number of people taking care of them. Right, Your Honor. But it is improved by making the employees permanent and having more accountability over them and having higher standards for their medical services. And I don't know how – That may be. I really am not in a position to evaluate or even to question the State's desire to have more direct employees, civil service employees, if that's their decision. But it doesn't seem like, to blame on the receiver's mandate, the idea that you're going to fire people and have no replacements for them and fire them on very short notice at a time when, according to the affidavits, you need increased care over the holidays and to give them very short notice and not let them even stay to help train the nonexistent replacements. That isn't – it raises some questions, at least for a trial, as opposed to summary judgment, it would seem. I see your point, Your Honor. However, on the issue of notice, the evidence does show that as early as February 2006, it was common knowledge throughout Pelican Bay that contract jobs were eliminated. That really doesn't speak to the termination here, though, does it? I mean, they were told – I've forgotten the date – December 20th or something like that, that as of December 30th or 31st, that's it. There's not a replacement worker showing up. The fact that it's been knowledge for nearly two years that contract workers are being I'm not trying to say that I'm bowled over by the strength of the plaintiff's case, for what it's worth, which isn't much. I'm not. But why isn't that enough to survive summary judgment? Why isn't that a he – well, it's not he said – it's they said versus they said case?  Well, it's been in place by your account for nearly two years. And yet the actual termination on pretty short notice does come in temporal proximity. That may not conclusively prove the connection, but why isn't that enough at least to say, well, this is a genuine issue of material fact? Well, just based on appellant's admissions, that they knew that it was happening. They knew their jobs were in danger. They were concerned enough to apply for permanent civil service positions. Brenda Davis did in March 2007. Roy did in September 2007. But then they were awarded those jobs, but then they decided to quit those jobs because they liked the higher pay of the contractor's salary. Plus, they liked being able to have their own contracting company and collect commissions and finder's fees off of hiring themselves out. So based on their admissions and their depositions, Your Honor, I believe that's how the district court got over the summary judgment standard. Well, I guess I'm going to ask it just a little bit different way, but the question is much the same. When I'm – when I'm looking as to whether there's a genuine issue of material fact, and you – you've kind of given away that the three months after the complaints were filed and a few days after the plaintiff followed up on those complaints, they were fired. That – it looks bad. You've kind of given that away even in your argument. Then you add to it what you're arguing seems like just a good jury question. Well, we had to do this, and the reason we didn't do it is because it takes a long time and it does all that. But that still has a genuine issue of fact. If you don't replace these people, their positions remain open for a long period of time. If you were shorthanded, if the suicides were high at the time of the termination, which is what is there, and if their firing would reduce the access to medical care, then it seems to be a tough issue on that standard. And then you add to it all these ideas about what McCarthy met with Davis and told Davis. I'm trying to get to the standard. I don't think so. She's nodding her head. I'm just trying to say, after all of that, why isn't a genuine issue of fact? That's the question. Right. Well, another part of that is there isn't any retaliatory animus shown. Appellant has pointed to McCarthy's comments and Archambault's comments, but Maureen McLean was the hiring authority as the health care manager. She was the decision maker in terms of the hiring and the firing. And according to her declaration, Ms. Davis never went to her with complaints about Mandel. And so there's a lack of causal connection, and there's also lack of animus. And if you look at the statements that appellants refers to in terms of McCarthy and Archambault, they're isolated. It's not really connected to anything that Davis experienced. So we would submit that they're lacking on both those elements. Okay. Is that about it? If there's no more questions, I'll submit on that. All right. Thank you. Thank you. Thank you, Your Honors. I only want to point out, I think it sounds to me like you understand the issues. Well, we usually do. Yes. I know that. If there's any question about whether she provided a complaint that would be deemed protected activity, I just want to direct the Court's attention to the supplemental excerpt of Record 566, which is a memorandum from Mr. Nimrod. The subject is formal complaint acknowledgement letter, and he says that he completed the evaluation of your discrimination complaint, yours being Ms. Davis, regarding sexual harassment, disparate treatment by Dr. Mandel, have also reviewed the retaliation complaint against Dr. Archambault. So there is clearly, at least I think there's a lot of other protected activity that she engaged in with respect to some of her reports, and it's contained in her declaration. But this one, there's no doubt about it. So with that, I'll ---- Thank you. Thank you very much. I trust on the briefs. Thank you. The case, as argued, will be submitted. The Court will stand in recess for the day.
judges: Reinhardt, Clifton, Smith